IN RE: J. W. R., D. C. R., AND D. J. R.

NO. 21-CA-691

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 10,24, DIVISION "C"
HONORABLE CONNIE M. AUCOIN, JUDGE PRESIDING

March 03, 2022

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Stephen J. Windhorst, and John J. Molaison, Jr.

**AFFIRMED**
    **JGG**
    **SJW**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PARENT/APPELLEE,
G. R.
    Martha J. Maher

COUNSEL FOR MINOR/APPELLEE,
J. W. R., D. C. R., AND D. J. R.
    Lauren Davey Rogers

COUNSEL FOR PARENT/APPELLANT,
C. M. B., MOTHER
    Joseph B. Rochelle

**GRAVOIS, J.**

C.M.B., the biological mother of the three minor children involved in this adoption proceeding, appeals a judgment of the trial court granting a Petition for Stepparent Adoption. Based on our review of the record and the totality of the circumstances, we find that the trial court was not clearly wrong or manifestly erroneous in finding that C.M.B. "has refused or failed to comply with a court order of support, without just cause, for a period of at least six months," per La. Ch.C. art. 1245(C)(1), that C.M.B. "refused or failed to visit, communicate, or attempt to communicate with the child[ren] without just cause for a period of at least six months," per La. Ch.C. art. 1245(C)(2), and that the proposed adoption is in the best interest of the minor children. Accordingly, for the reasons that follow, we affirm.

**FACTS AND PROCEDURAL HISTORY**

K.W.R. and C.M.B. were married on June 5, 2006. Three children were born of the marriage: J.W.R., a son born on November 3, 2005, D.C.R., a son born on August 1, 2007, and D.J.R., a son born on May 21, 2010.[1] K.W.R. and C.M.B. divorced on March 6, 2015. On July 6, 2017, a Consent Judgment was rendered regarding K.W.R. and C.M.B.'s custody of their minor children. The Consent Judgment stated that the parties were awarded joint custody of the children, with K.W.R. being designated as domiciliary parent. C.M.B. was granted unsupervised physical custody of the children every other weekend, with pick-up and drop-off occurring at K.W.R.'s mother's home. The Consent Judgment reflected that each year both parties would have vacation options with the children and that the parties would be entitled to visitation with the children on alternate holidays each year. Further, the Consent Judgment stated that each parent would be entitled to

---

[1] The initials of the children and their parents are used to protect the identity of the minor children. Uniform Rules-Courts of Appeal, Rules 5-1, 5-2.

reasonable telephone contact with the children when they were with the other parent and that the children could contact either parent any day at any reasonable time. The parties agreed to follow the co-parenting guidelines as stated in the Consent Judgment. Finally, the Consent Judgment stated that the children were not to have any contact whatsoever with Michael Chartier.[2] Additionally, the record reflects that a child support obligation of C.M.B. in the amount of $330.00 per month payable to K.W.R. was established on September 25, 2017.

On June 29, 2019, K.W.R. married G.M.A.R. On May 15, 2020,[3] K.W.R. and G.M.A.R. filed a Petition for Stepparent Adoption, wherein G.M.A.R. sought to adopt the minor children J.W.R., D.C.R., and D.J.R. The petition alleged that C.M.B. had not had any contact with the children for more than two years and had not contributed any financial support to the children. K.W.R. gave his written consent to G.M.A.R.'s adoption of the children.[4]

On August 6, 2020, K.W.R. and G.M.A.R. requested that the trial court appoint a Curator Ad Hoc to represent C.M.B. since attempts to locate her were unsuccessful. On that same day, the trial court appointed Juanita Marino as C.M.B.'s Curator Ad Hoc. Ms. Marino filed an Answer to the Petition on August 13, 2020, denying the allegations of the same. At the trial on the Petition for Stepparent Adoption on October 14, 2020, C.M.B. appeared *pro se* and objected to the adoption. After brief testimony by C.M.B. and K.W.R., the trial court recessed and stayed the remainder of the matter. On December 22, 2020, the trial court appointed an attorney to represent the minor children pursuant to La. Ch.C. art. 1244.1(B). On February 1, 2021, the trial court appointed an attorney to represent

---

[2] At trial, C.M.B. testified that she is still involved with Mr. Chartier. He currently lives with her and is the father of two of her other children.

[3] The trial court's reasons for judgment states that the petition was filed on June 5, 2020. The record reflects, however, that the petition was actually filed on May 15, 2020.

[4] The suit was originally filed in the 24th Judicial District Court (Jefferson Parish). It was transferred to the 29th Judicial District Court (St. Charles Parish) in July of 2020.

C.M.B. after she indicated that she could not afford one. On February 19, 2021, C.M.B. filed a Declinatory Exception of Insufficiency of Citation and Notice and Opposition and Answer to Petition for Stepparent Adoption. At a hearing on March 23, 2021, the trial court denied the exception.

The trial on the Petition for Stepparent Adoption proceeded on July 19, 2021. At the conclusion of the trial, the trial court requested that the parties file post-trial briefs. On August 27, 2021, the trial court signed a written judgment granting the Petition for Stepparent Adoption. In its extensive written reasons for judgment, the trial court found that there were three periods of time when C.M.B. failed to furnish her child support payments: a period of five months and 16 days from September 25, 2017 to March 13, 2018; a period of at least 10 months from June 2018 until April 2019; and a period of seven months and 29 days from June 26, 2019 through February 20, 2020. The court found that C.M.B. failed to demonstrate "just cause" for her failure to pay her child support obligation. Further, the trial court found that both K.W.R. and G.M.A.R. testified that C.M.B. only saw the children two or three times in the last six years and that she plays almost no role in the children's lives. All three children testified that they had not seen C.M.B. in approximately two to five years. The trial court found that C.M.B. did not demonstrate just cause for her failure to visit or communicate with the children. The trial court stated that C.M.B. knew where the children lived in Westwego, and after they moved to Norco, she made no substantive attempts to find them. Finally, the trial court noted that C.M.B. never moved the court for contempt of the Consent Judgment relative to K.W.R.'s alleged attempts to hide the children from her. Finally, the trial court found that the adoption was in the best interest of the children. The trial court noted that the evidence showed that G.M.A.R. knows the children and their needs, and C.M.B. has played no role in her children's lives.

This timely appeal followed. On appeal, C.M.B. argues that the trial court erred in granting the intrafamily adoption because the evidence and testimony show that there was never a six-month period between June 2017 and January 2021 when she did not attempt to contact the children; that she was paying substantial child support payments in the six months immediately prior to the filing of the Petition for Stepparent Adoption, and any previous lapses in payments were not without just cause; and that the adoption is not in the best interest of the children.

## LAW AND ANALYSIS

Intrafamily adoptions, the adoption of a child by a stepparent or certain other relatives, are authorized by the Louisiana Children's Code. La. Ch.C. arts. 1170, 1243. Under La. Ch.C. art. 1245(C), the consent of a biological parent is not required for adoption by a stepparent petitioner married to the parent with lawful custody when either (1) the other parent "has refused or failed to comply with a court order of support, without just cause, for a period of at least six months," or (2) the other parent "has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months."

The party petitioning for adoption has the initial burden of proving that a biological parent's consent is not required due to the parent's nonsupport of or lack of communication with the child by clear and convincing evidence. *In re Orgeron*, 94-458 (La. App. 5 Cir. 11/16/94), 646 So.2d 1137, 1139; *In re R.A.L.*, 54,052 (La. App. 2 Cir. 7/14/21), 323 So.3d 1006, 1015-16. Once a *prima facie* case is proven, the opposing parent then has the burden of proving that his failure to provide support or communicate with his child was with "just cause," or due to factors beyond his control. *In re C.B.*, 94-0755 (La. 10/17/94), 643 So.2d 1251, 1253; *In re D.D.D.*, 06-2274 (La. App. 1 Cir. 5/4/07), 961 So.2d 1216, *rehearing denied*, *writ denied*, 07-1669 (La. 8/31/07), 962 So.2d 436, *certiorari denied*, 552 U.S.

1195, 128 S.Ct. 1243, 170 L.Ed.2d 85. The trial court must thereafter consider whether the adoption is in the best interest of the child. *In re Orgeron*, *supra*.

Upon review of a decision regarding intrafamily adoption, a reviewing court should affirm the trial court where the judgment is not clearly wrong or manifestly erroneous because the determination of whether the adoption is in the best interest of the child must be decided on the facts of each case. *In re B.V.G.*, 04-969 (La. App. 5 Cir. 12/14/04), 893 So.2d 106, 108, *writ denied*, 05-0109 (La. 1/26/05), 893 So.2d 56.

### *Child Support*

C.M.B. argues that the evidence and testimony presented at trial reveal that she was paying substantial child support in the six months immediately prior to the filing of the Petition for Stepparent Adoption. Nevertheless, C.M.B. argues that to the extent there were any past lapses in her court-ordered support, it was not without "just cause."

George Higgins, an attorney supervisory at Department of Children and Family Services ("DCFS"), testified at trial regarding C.M.B.'s child support payment history. He testified that C.M.B.'s child support obligation of $330.00 per month was established on September 25, 2017, and that a wage assignment was issued in the child support case. Regarding wage assignments, he testified that often there are arrears; thus DCFS will collect more than the ongoing obligation each month in order to catch up on the arrears. He confirmed that the child support payment history submitted into evidence reflects that C.M.B. made *zero child support payments* from September 2017 until March 2018; from July 2018 until April 2019; and from July 2019 until February 2020. According to C.M.B.'s child support payment history, in the six months immediately preceding the filing of the petition, she made the following payments: February 2020, $198.46; March 2020,

$396.92; April 2020, $396.92; and May 1, 2020, $198.46.[5] As of the date of trial on July 19, 2021, Mr. Higgins testified that C.M.B. was in arrears for $660.00 for May and June of 2021.[6]

At trial, C.M.B. testified that when the child support obligation was established in 2017, she was working about 15 hours per week at Little Caesars making $7.25 an hour. She could not work more hours because Little Caesars would give their managers scheduling priority. C.M.B. took home about $220.00 every two weeks while working at Little Caesars. At that time, she was also supporting her two other small children that lived with her. In 2018, C.M.B. was employed at St. Luke's, a nursing home, as a receptionist making $9.50 an hour and working around 20 hours a week. On April 29, 2019, she had another child and took an unpaid maternity leave. Prior to giving birth, she testified that she had too much amniotic fluid and that the doctor suggested she rest up "because the baby was having problems." After she had the baby, C.M.B. testified that she had to wait another six weeks before she could go back to work. She later began

---

[5] The following chart represents C.M.B.'s child support payments from September 2017, when her child support obligation was imposed, until May 15, 2020, when the Petition for Stepparent Adoption was filed.

| Date | Child Support Obligation Collected |
| --- | --- |
|  |  |
| September 2017 – February 2018 | $0 |
| March 2018 | $1,650.00 |
| April 2018 | $0 |
| May 2018 | $0 |
| June 2018 | $163.83 |
| July 2018 – March 2019 | $0 |
| April 2019 | $95.24 |
| May 2019 | $76.18 |
| June 2019 | $76.18 |
| July 2019 – January 2020 | $0 |
| February 2020 | $198.46 |
| March 2020 | $396.92 |
| April 2020 | $396.92 |
| May 1, 2020 | $198.46 |

[6] Based on the child support payment history submitted as evidence, from May 18, 2020 until the date of trial on July 19, 2021, C.M.B. paid $11,502.24 in child support payments.

working at Pizza Hut, where she started out making $9.50 an hour and then got a raise to $10.00 an hour. While at Pizza Hut, she worked "around the clock" working 38 hours some weeks and 55 hours other weeks. She stated that she did file a request that the child support obligation be reduced with the juvenile court because she wasn't making enough money; however, she testified that her boss would not let her off of work so "there was no point for [her] to go to court to reduce it." She also testified that once she got the job at Pizza Hut, she realized she could "do it." She admitted that she is in arrears for $660.00 at the time of trial because her two sons were sick, and she had to take care of them. At the time of the trial, she was not employed but planned on going back to work.

On appeal, C.M.B. argues that the trial court erred in considering the periods of nonpayment outside of the six-month period immediately prior to when the Petition for Stepparent Adoption was filed. She also argues that the evidence presented showed that she was paying substantial child support in the months immediately preceding the filing of the petition.

In *Haynes v. Mangham*, 375 So.2d 103 (La. 1979), the Louisiana Supreme Court interpreted La. R.S. 9:422.1, the predecessor to La. Ch.C. art. 1245.[7] The Court stated:

> The language "refused or failed to comply with a court order of support for a period of one year" can be interpreted in a number of

---

[7] La. Ch.C. art. 1245 was added by Acts 1991, No. 235, § 12, effective January 1, 1992. La. R.S. 9:422.1 stated at the time of *Haynes*:

> If the spouse of the petitioner is the legitimate parent of the child or if the petitioner is the grandparent or grandparents of the child, then the consent of the other legitimate parent is not necessary if the first and second or the first and third conditions exist:
>
> (1) The spouse of the petitioner or the grandparent or grandparents or the mother or the father have been granted custody of the child by a court of competent jurisdiction and
>
> (2) The other legitimate parent has refused or failed to comply with a court order of support for a period of one year or
>
> (3) The other legitimate parent is a nonresident of this state and has failed to support the child for a period of one year after judgment awarding custody to the mother or father or grandparent or grandparents.

ways: It can be interpreted on the one extreme so rigorously as to apply even to the parent who pays each month for twelve consecutive months prior to suit, but in each case for an arrearage, so that for the full twelve months he had never been in full compliance with the court order, and on the other extreme so leniently as to permit any payment however small, within twelve months prior to the filing of the petition for adoption and irrespective of the amount of accumulated arrearages, to suffice to prevent application of the statute. Neither of these extremes is acceptable.

Required as we are to achieve a result in this litigation by interpreting and applying the statute, we find that a common sense interpretation is the following: If a parent under court order to support a child has not made a significant support payment within a year prior to filing of the petition for adoption, that parent loses the right to prevent the adoption by withholding consent.

*Id.* at 105.

The Court also noted that it was mindful of its previous decision in *In re Ackenhausen*, 244 La. 739, 154 So.2d 380 (1963), where it held that one $50 payment within a year of suit on a $1,440 annual support obligation could not prevent the child's adoption under La. R.S. 9:422.1. The Court stated there that despite the jurisprudential rule that laws providing for adoption should be strictly construed, La. R.S. 9:422.1 should not be so narrowly interpreted that any payment within the year could prevent the adoption. *Id.* at 383.

In *Haynes*, the father consistently paid his child support obligation payments of $400.00 per month until August of 1976. Thereafter, his next payment was for $1,200.00 (the equivalent of three months' payments) on March 31, 1977. He made no additional payments after that. A petition for adoption was filed in December of 1977. *Id.* at 104. The Supreme Court found that the father's payment, made within a year of the filing of the petition for adoption, was 25% of his yearly obligation and was 42% of his arrearages at the time the payment was paid. *Id.* at 105. The Court found that this was a significant payment to bar the application of the statute. *Id.* at 106.

In *Anderson v. Ramer*, 27,469 (La. App. 2 Cir. 9/27/95), 661 So.2d 584, 586-587, the father's payment of $950.00 within the year before the institution of

adoption proceedings constituted 39% of his annual support obligation; however, this payment was less than 10% of the accumulated arrearage. The Second Circuit found that the trial court was in error in not considering the total history of noncompliance by the father with his support responsibility. After reviewing all of the circumstances, the Second Circuit could not find that the payments made by the father in the year preceding the petition for adoption to be significant. *Id*.

In the present case, in the six months immediately preceding the May 15, 2020 filing of the petition, C.M.B. did not pay any amount until February 24, 2020, when she paid $198.46. In March 2020, she paid $396.92, and in April 2020, she paid $396.92. On May 1, 2020, she paid $198.46.[8] Thus, in the six months immediately prior to the petition being filed, she paid $1,190.76, which is 60% of her six-month child support obligation. However, prior to February 2020, C.M.B. failed to make regular and substantial child support payments. From September 2017 until February 2020, a period of almost two and a half years, she only paid a total of $2,061.43, the equivalent of just over six months' payments. Though C.M.B. argues that she was only in arrears for $660.00 dollars at the time of the trial, the evidence shows that it wasn't until after the petition was filed that she consistently paid her child support obligation and that she paid a large additional sum toward her arrearages. Thus, we do not find that the payments made by C.M.B. in the six months preceding the filing of the Petition for Stepparent Adoption to be significant.

Upon review, taking into consideration the total history of non-compliance by C.M.B. with her child support obligation since her obligation was imposed (which included two periods of more than six months of no payments at all and one period of almost six months of no payments at all), we find that the evidence

---

[8] For the remainder of May 2020, C.M.B. paid an additional $396.92.

supports the trial court's determination that C.M.B. failed to comply with the court order of support imposed on her on September 25, 2017. La. Ch.C. art. 1245(C)(1).[9]

We also agree with the trial court's conclusion that there was no just cause for C.M.B.'s failure to pay her child support. C.M.B. testified that in 2017 and 2018, she worked at Little Caesars and St. Luke's, working 15-20 hours. Nonetheless, her payments during this time period were sporadic and insubstantial. We recognize that C.M.B. did seek to reduce her child support obligation in 2018; however, she ultimately never appeared at court for the hearing so there was no reduction. Further, she testified that once she became employed at Pizza Hut, she realized she could make the payments. However, she still failed to consistently pay her child support until February 2020.

Accordingly, based on our review of the record and the totality of the circumstances, we find that the trial court was not clearly wrong or manifestly erroneous in finding that C.M.B. "has refused or failed to comply with a court order of support, without just cause, for a period of at least six months." La. Ch.C. 1245(C)(1).

### *Contact with the Children*

C.M.B. also argues that the trial court erred in granting the adoption without her consent because the cell phone records submitted as evidence show that there was never a six-month period between June 2017 and January 2021 where she did not attempt to contact K.W.R. She argues that she was thwarted from visiting and communicating with her children by K.W.R. and G.M.A.R. She contends that the

---

[9] La. Ch.C. art. 1245(C)(1) provides that the consent of the parent as required by Article 1193 may be dispensed with upon proof by clear and convincing evidence at the hearing on the opposition and petition when the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and the other parent has refused or failed to comply with a court order of support without just cause "for a period of at least six months." Article 1245(C)(1) clearly does not limit our inquiry to the six-month period immediately prior to the filing of the petition.

evidence showed that nearly all of her calls were going to K.W.R.'s voicemail, and that once K.W.R. "began cutting off access," she did all she could to maintain contact.

At trial, G.M.A.R. testified that C.M.B. only visited with the children two or three times in the last six years, and that it had been more than two years since she last saw them. She stated that while living in Westwego, C.M.B. showed up to their house and spoke to the children for a little while and then left. According to G.M.A.R., in the last six years C.M.B. has not brought Christmas gifts, has not called for the children's birthdays and major holidays, and has not been involved in any of the children's school activities.

K.W.R. testified that since the 2017 Consent Judgment, the children have only had physical contact with C.M.B. two or three times. On one occasion in September or October 2017, C.M.B. came to their home in Westwego and talked to the children. That same year, he also brought them to the park to see her. When asked about how often C.M.B. called the children, he responded:

> Not really often. It's more of a one-way street. It's me calling her all the time to say, 'Hey, you know, you want to talk to your kids?' She's never really picked up the phone to say, 'Hey, I want to talk' -- or if she does, it's late at night when they're sleeping, or if I'm at work she calls them, 'Hey, can I talk to the boys?' I'm like, 'I'm at work.' I can't, you know –

K.W.R. testified that C.M.B. would call only when it was convenient for her. According to K.W.R., C.M.B. has not provided birthday gifts, birthday cards, and Christmas gifts to the children since 2017. She also has not participated in any of the children's school meetings or activities or any doctor appointments. He testified that he had tried to contact C.M.B. to keep her updated about the children, as required by the Consent Judgment, but he believed her phone was "cut-off, disconnected, or she had another number." He later testified that he did try to call C.M.B. on Christmas and the children's birthdays. If she answered, they would

speak with her, but if she didn't answer, there was nothing he could do. He stated that he never blocked C.M.B.'s number. He admitted he received two voicemails from C.M.B. after court hearings in 2017.

C.M.B. testified that after the Consent Judgment was reached in 2017, she and K.W.R. had no issues; however, in 2018, when she called K.W.R. to inquire about seeing the children, she was told that she couldn't see the children again because she wasn't paying child support. She testified that at this time, her calls started going to his voicemail. She testified regarding two occasions when she went to the children's Westwego residence in 2018. On the first occasion, she knocked and could hear voices inside, but no one answered the door. On the second occasion, the children were leaving the house when she arrived, so she was able to talk with them for ten minutes until they left. She also would meet the children when K.W.R.'s mother would take them to the park or take them for ice cream. This occurred in 2017 and 2018 until K.W.R.'s mother was no longer allowed to see the children. She testified that she did not know that they had moved to Norco until she came for a court date in October. She stated that she has had the same cell phone number for six or seven years, and that K.W.R. did not always return her phone calls. When K.W.R. would call her, he would tell her that the children didn't want to speak to her. She admitted that in the year preceding the filing of the petition, she only called six times and sent four text messages, and that she never saw the children. When questioned about why she stopped trying to call, she stated that she didn't call much because it was hurtful when she would call and couldn't get in touch with anyone.

Hillary Rapson, a custodian of records for T-Mobile (formally Sprint), testified at trial regarding the phone records between C.M.B. and K.W.R. from March 6, 2015 to January 28, 2021. According to the records submitted as evidence, in the year prior to the filing of the Petition for Stepparent Adoption,

from May 2019 to May 2020, C.M.B. called or texted K.W.R. on four different days.[10] The records show that these calls were routed to voicemail. According to Ms. Rapson, one cannot glean from the records if voicemails are listened to or not, or if a call went to voicemail because it was blocked.

Upon review of the entire record, considering all the facts and circumstances presented, we find that the trial court was not clearly wrong or manifestly erroneous in finding that G.M.A.R. met her burden of proving that C.M.B. "refused or failed to visit, communicate, or attempt to communicate with the child[ren] without just cause for a period of at least six months." La. Ch.C. art. 1245(C)(2).[11] The parties do not dispute that C.M.B. had not seen the children since 2018. It is also undisputed that she has not provided birthday or Christmas gifts to the children since 2017. In the six months prior to the Petition for Stepparent Adoption being filed, the cell phone records do show that calls were made on both December 25, 2020 and May 3, 2020 to K.W.R.'s phone number. However, the only information that is gleaned from these records is that the calls went to voicemail and lasted mere seconds. We do not find this to be sufficient proof of attempts by C.M.B. to contact the children. C.M.B. argues that K.W.R. thwarted her attempts to maintain a relationship with her children. To constitute "just cause," a parent's failure to support, visit, or communicate with his children must be due to factors beyond his control. *In re B.L.M.*, 13-0448 (La. App. 1 Cir.

---

[10] The calls and/or texts took place on May 21, 2019, August 19, 2019, December 25, 2019, and May 3, 2020. Prior to that, the records indicate that she called and/or texted in the following months: June – December 2017; January – June 2018; August – December 2018; February 2019, and April 2019.

[11] La. Ch.C. art. 1245(C)(2) provides that the consent of the parent as required by Article 1193 may be dispensed with upon proof by clear and convincing evidence at the hearing on the opposition and petition when the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and the other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause "for a period of at least six months." Article 1245(C)(2) clearly does not limit our inquiry to the six-month period immediately prior to the filing of the petition.

11/1/13), 136 So.3d 5. C.M.B. admitted that she failed to take any action, specifically with the court, when she believed K.W.R. was thwarting her attempts at seeing the children. Further, though she asserts her calls were blocked, the cell phone records could not show whether or not a call was blocked.

Accordingly, we find that the trial court was not clearly wrong or manifestly erroneous in finding that G.M.A.R. met her burden of proving that C.M.B. "refused or failed to visit, communicate, or attempt to communicate with the child[ren] without just cause for a period of at least six months." La. Ch.C. art. 1245(C)(2).

### *Best Interest of the Children*

C.M.B. also argues the trial court erred in finding that the adoption was in the children's best interest since she demonstrated that she previously enjoyed a good relationship with the children and desires to continue with that relationship.

Even where the other parent's consent is obviated by failure to visit or communicate with his child, the court must still consider whether the adoption is in the best interest of the child. *In re D.D.D.*, 961 So.2d at 1222. Courts must make this determination by examining the child's relationship with the stepparent and the noncustodial natural parent. *Id.* Important factors include the depth and closeness of the child's ties with the noncustodial natural parent, the effect which the loss of this relationship would have on the child, the seriousness and finality of severing the relationship between the parent and child, and the importance and benefit to the child of a continued relationship with the parent. *In re C.E.F.*, 07-0992 (La. App. 1 Cir. 9/14/07), 977 So.2d 1, 7.

At trial, G.M.A.R. testified that she's been with K.W.R. for six years, and has lived with the children since 2017. She testified that she is closely involved in their daily lives and has come to love the children as her own.

As previously noted, its undisputed that C.M.B. had not seen the children since 2018. It was also undisputed that since 2017, she had not provided them consistently with Christmas or birthday presents and had not participated in any of the children's school meetings or activities, as well as any of their doctor visits. Though she alleges that her attempts to be in the children's lives were thwarted by K.W.R., there was no evidence presented that she took any action in court concerning her inability to see or talk to the children.

Additionally, all three children testified that they wished to be adopted by G.M.A.R. D.J.R. and D.C.R. testified that they wanted to be adopted because G.M.A.R. was there for them. D.C.R. testified that his dad told him that C.M.B. did not want to talk to him. Also, D.J.R. testified that his dad and G.M.A.R. told him that his mom has three other children and does not worry about him and his brothers. When the trial court questioned K.W.R. regarding these statements, he testified that he did not recall making them. He said that he told the boys that if they wanted to talk to C.M.B., he'd call her. He concluded by saying, "And there was [sic] times lately they've been saying they don't want to talk to her. You know, they don't want to - - 'Don't call her.' I'd go, 'Okay.'"

As a reviewing court, we may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. *Stobart v. State, Department of Transportation and Development*, 617 So.2d 880, 882 (La. 1993). When factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact's findings, because only the trier of fact can be aware of the variations

in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989).

Considering all of the facts and evidence presented, we find that the trial court was not manifestly wrong or clearly wrong in finding that the proposed adoption is in the best interest of the minor children. Accordingly, we find no error in the trial court's judgment granting the Petition for Stepparent Adoption.

## DECREE

For the foregoing reasons, the trial court's judgment granting the Petition for Stepparent Adoption is affirmed.

## AFFIRMED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MARCH 3, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 21-CA-691

**E-NOTIFIED**
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE CONNIE M. AUCOIN (DISTRICT JUDGE)
MARTHA J. MAHER (APPELLEE)          LAUREN DAVEY ROGERS (APPELLEE)

**MAILED**
JOSEPH B. ROCHELLE (APPELLANT)
ATTORNEY AT LAW
110 AVENUE OF OAKS
DESTREHAN, LA 70047